IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

RAYMOND BUFORD, Individually and on                                    PLAINTIFF
Behalf of Others Similarly Situated

VS.                                NO. 4:17-cv-00323-KGB

SUPERIOR ENERGY SERVICES, LLC,
COMPLETE ENERGY SERVICES, INC., and
TEXAS CES, INC. d/b/a SPN WELL SERVICES a/k/a
MERCER WELL SERVICES                                                  DEFENDANTS

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

I.    **INTRODUCTION**

Plaintiff Raymond Buford filed this action against Superior Energy Services,

LLC ("Superior"), Complete Energy Services, Inc. ("Complete"), and Texas CES, Inc.

d/b/a SPN Well Services a/k/a Mercer Well Services ("Texas CES") asserting

violations of the Fair Labor Standards Act, the Arkansas Minimum Wage Act, and

the Family Medical Leave Act.[1]

Defendant Texas CES (not Superior or Complete) employed Buford as a rig

supervisor, also known as a toolpusher, in its Magnolia Yard.  In that role, Buford

made over $100,000.00 each year in 2013, 2014 and 2015, the last three years he

worked for Texas CES.  As rig supervisor and the senior person on-site, Buford

managed a crew of four workers, including two who worked on the well itself, one

---

[1] Buford filed his consent in December 2017, more than two years after his employment with Texas
CES ended.  Only one other rig supervisor from the Magnolia Yard filed a consent – Lance Taylor,
whose last day at work for Texas CES was October 30, 2015.  Taylor's consent was not filed prior to
the discovery deadline or prior to the two year statute of limitations under the FLSA.

who worked in the derrick above, and one who operated the rig itself. Buford testified that two things were emphasized at Texas CES – safety and documentation.  In fact, Buford's own opinion was that his most important job was to ensure his crew got home safely each day.  Commenting on the roles his crew played, Buford stated he was "too old and wore out" to be anything but a rig supervisor.

Buford now claims Texas CES (and the company it purchased in 2008, Theral Story Well Services ("TSWS")) misclassified his role as exempt. Buford also claims that Texas CES improperly terminated his employment in late 2015 when it shut down the Magnolia Yard (even though it offered Buford another job at another yard, which he summarily declined) due to a significant drop in the oil and gas business.

Because Buford's role as a rig supervisor was exempt under both the highly compensated employee exemption and the executive exemption, and because Buford was not eligible for FMLA leave and not entitled to his job after the shutdown of the entire Magnolia Yard, his claims under the Fair Labor Standards Act, the Arkansas Minimum Wage Act and the Family and Medical Leave Act should be dismissed.


II.    SUMMARY OF RELEVANT FACTS

A.    Background on Texas CES.

Texas CES provides services to oil and gas operations from the "birth" of a well, to maintenance and restoration of a well, to the "plug" and abandonment of a well.  Ex. 1 (Hutchinson decl.).  Texas CES's only Arkansas-based operation was its Magnolia Yard located in Magnolia, Arkansas, which was acquired in 2008 when

2

Texas CES purchased Buford's former employer, TSWS.  Ex. 1 (Hutchinson decl.); Ex. 2 (Hauger decl.).  Buford worked for TSWS dating back to the early 1990s, and was a rig supervisor based at the Magnolia Yard when Texas CES acquired TSWS. Ex. 1 (Hutchinson decl.); Ex. 2 (Hauger decl.); Ex. 3 (Buford dep. at 21).  TSWS and Mercer Well Services (which is mentioned in the style of the case) are both d/b/as of Texas CES.  Ex. 2 (Hauger decl.).  Texas CES is a subsidiary of Superior Energy Services – North America, Inc.  Ex. 4 (Clark decl.).

## B.     Buford's pay and job responsibilities as a rig supervisor.

### 1.     Buford was paid over $100,000 per year; his crew was paid significantly less on an hourly basis.

Buford started work at TSWS as a derrickhand.  TSWS promoted him to rig operator and eventually to rig supervisor prior to TSWS being acquired by Texas CES in 2008.  Ex. 1 (Hutchinson decl.); Ex. 2 (Hauger decl.); Ex. 3 (Buford dep. at 21, 103).  TSWS paid rig supervisors on a salary-basis, and Texas CES continued this practice when it acquired TSWS.  Ex. 1 (Hutchinson decl.); Ex. 2 (Hauger decl.). In fact, Texas CES did not change anything about employee pay or benefits when it acquired TSWS.  Ex. 1 (Hutchinson decl.).

During each of the last three years of his employment with Texas CES, Buford made over $100,000.00, and his base salary well exceeded $455 per week. Ex. 3 (Buford dep. at 96-97, attachment 1); Ex. 4 (Clark decl.).  Members of the crew he supervised (all hourly paid workers) made considerably less – $16 per hour for floorhands, $17.50 per hour for derrickhands, and $19-$20 per hour for rig

3

operators. Ex. 4 (Clark decl.). This is because Texas CES viewed Buford's role as a rig supervisor as crucial – he not only managed the crew, but also was the senior person on-site who dealt with the customer's representative. Ex. 5 (Pittman decl.).

### 2. *As a rig supervisor based out of the Magnolia Yard, Buford was the senior person on-site for Texas CES and supervised a four person crew.*

After the 2008 acquisition, Buford worked for Texas CES mostly out of the Magnolia Yard. Ex. 1 (Hutchinson decl.). According to Buford's daily field tickets (documentation he filled out detailing, among other things, the names of the crew members and the hours they worked, well site locations, and the work performed on the well), Buford managed his crew in parts of Arkansas and Louisiana from May 2014 until he left Texas CES in October 2015. Ex. 2 (Hauger decl.).

As the rig supervisor, Buford was the senior person on-site for Texas CES.[2] Ex. 3 (Buford dep. at 41). Buford supervised a crew of four employees. Ex. 1 (Hutchinson decl.); Ex. 3 (Buford dep. at 21-22). The four crewmembers included two floorhands, who did manual work on the well itself; a derrickhand who "goes up in the derrick" above the well and uses a tubing/rod elevator to latch onto tubing or rods coming out of or going into the well; and a rig operator who moves the rig to the location and attaches it to the well – the rig operator in fact "runs the rig." Ex. 3 (Buford dep. at 9-11, 16-17, 21-22); Ex. 5 (Pittman decl.); Ex. 6 (Menchaca decl.).[3]

---

[2] "Once in a while," Buford's yard manager might come out to the well site. Ex. 3 (Buford dep. at 116-117). Typically, appearances by a yard manager were infrequent at best and short – just a couple of hours. Ex. 6 (Menchaca decl.).
[3] The rig is a mobile derrick that simply backs up over the well. Ex. 3 (Buford dep. at 11-12).

1610792-v1

Buford's role as rig supervisor was to keep his crew pointed in the right direction. Ex. 3 (Hutchinson decl.); Ex. 6 (Menchaca decl.).

Buford only had one crew at a time – he would not have one crew at one well site and another crew at another well site.   Ex. 3 (Buford dep. at 51).   Buford testified he had a "great crew" with very little turnover – he could "count on them" to do their jobs. Ex. 3 (Buford dep. at 23, 47).  Buford described well site work as a chain of command.   Ex. 3 (Buford dep. at 66).   When his crew was not sure of something, he stepped in, and usually he was "standing right there with them before they asked the question." Ex 3 (Buford dep. at 68).  Mostly, his crew was smart enough to know what to do; he was necessary when someone needed to tell the crew what to do or how to do it.  Ex. 3 (Buford dep. at 67).

Buford's crew was always younger than him, and Buford testified he could not have gone back to being a derrickhand, a floorhand, or even a rig operator because he was "too old and wore out" for those jobs.[4]   Ex. 3 (Buford dep. at 47-48).

As the senior man at the well site, he had overall responsibility on behalf of Texas CES.  If something went wrong at the well site, Buford was the one who got in trouble.  Ex. 3 (Buford dep. at 41).

---

[4] Buford had triple bypass surgery in 2010; he was out for several weeks.  Ex. 3 (Buford dep. at 93-94); Ex. 4 (Clark decl.).  After returning to work, he was limited in the amount of physical activity he could perform.  Ex. 3 (Buford dep. at 95-96).  As he put it, "You just couldn't overbear yourself," and "I had to figure out my limitations."  Ex. 3 (Buford dep. at 94-95).  According to Buford, his crew helped pick up the slack for him after his return.  Ex. 3 (Buford dep. at 96).

1610792-v1

### 3. *The safety of his crew was Buford's main job duty as a rig supervisor.*

A person could not just walk off the street and be a rig operator (much less a rig supervisor like Buford) because "[y]ou got to learn a bunch of stuff." Ex. 3 (Buford dep. at 39-40). Further, when Texas CES acquired TSWS, Buford described the transition as going from a "mom-and-pop" operation to a "big corporate" operation. See Ex. 3 (Buford dep. at 21). Two big differences – there was a lot more emphasis on safety and a lot more emphasis on documentation. Ex. 3 (Buford dep. at 23). Importantly, the emphasis on safety and documentation was not an isolated thing – in fact, it was a daily focus. Ex. 3 (Buford dep. at 21, 23-24, 76-78); Ex. 6 (Menchaca decl.).

Part of being a rig supervisor for Texas CES included attending mandatory internal training sessions – H2S[5] classes, well control school and safety training. Ex. 3 (Buford dep. at 129-130, 132). In fact, Buford described the safety of his crew as his most important duty he had as the rig supervisor – "making sure his hands go home the way they came" with "all of their fingers and toes" was his main goal each day. Ex. 3 (Buford dep. at 20, 40). This overarching safety role included running the initial safety meeting on-site every morning, which Buford documented daily. Ex. 3 (Buford dep. at 23-24). Additionally, Buford would shut down well site operations if he felt his crew needed a break due to the heat or if he felt they were "breathing too much of that gas" from the well. Ex. 3 (Buford dep. at 71-73). Although he testified any of his crew could shut things down, in practice it was

---

[5] H2S refers to hydrogen sulfide, a colorless but poisonous gas that occurs naturally in crude petroleum and natural gas. *See* https://www.osha.gov/Publications/hydrogen_sulfide.html.

Buford who normally shut down the well site if needed.  Ex. 3 (Buford dep. at 72-73).

Being a rig supervisor also involved documentation – a lot more of it after Texas CES came into the picture.  Ex. 3 (Buford dep. at 21, 23-24).  His daily paperwork sometimes took longer than two hours to complete.  Ex. 3 (Buford dep. at 78).  In addition to filling out daily safety documentation, Buford filled out daily field tickets that detailed the specific work done at the well site, the cost of everything done at the well site for the day (including pipe tallies, rod and tubing counts, and the calculation of the amount of fluid used), and the specific hours worked by Buford's crew.[6]  Ex. 3 (Buford dep. at 25, 43-44, 76-78, 98-99, att. 3).  It was Buford's responsibility to ensure each member of his crew signed off on the number of hours worked each day.  Ex. 3 (Buford dep. at 43, 98-99, att. 3).

Other important jobs of a rig supervisor were to a) make sure the crew showed up, although he never really had that problem; b) be a "teacher" or "trainer" for members of the crew that needed training, c) ensure the right equipment from Texas CES was at the site; d) ensure the overall job was accomplished for Texas CES; e) talk to the customer on-site (referred to as the "company man") and get instructions for the day; and f) take care of whatever needed to be done in the company man's absence.  Ex. 3 (Buford dep. at 20, 22-23, 38, 40-41, 49, 74).  As rig supervisor, Buford would take "care of the company man's business while he went off to take care of more business," which could include dealing with other vendors or companies coming on the well site – "water trucks, pipe trucks, trucks coming in

---

[6] Buford turned in no field tickets after October 20, 2015.  Ex. 2 (Hauger decl.).

7

with rods, tubing, going out with rods and tubing, all such as that." Ex. 3 (Buford dep. at 25-27).

Overall, Buford had a "bigger load" in terms of responsibilities as a rig supervisor at Texas CES compared to TSWS, despite the fact that he still had the same number of people (an operator, a derrickhand, and two floorhands) working on the rig for him. Ex. 3 (Buford dep. at 21-23).

### 4.    *A typical day for Buford and his crew.*

Buford and his crew would travel to the well site in two trucks. Ex. 3 (Buford dep. at 45). Buford would travel in one truck by himself (a truck he would take home at night), and the rest of the crew would be in another truck driven by the rig operator. Ex. 3 (Buford dep. at 45, 69). Both trucks would be used to haul equipment, tools and supplies to the well site. Ex. 3 (Buford dep. at 46).

A typical day for Buford and his crew included meeting at the yard, getting any needed supplies, traveling to the well location, having the daily safety meeting, discussing what was going to be done that day and opening the well, relieving any pressure and killing the well if necessary. Ex. 3 (Buford dep. at 58-59). When Buford's crew was setting up for a job, his role in the rigging-up process was to "see that it's done properly." Ex. 3 (Buford dep. at 113). Buford's job also included monitoring the pressures within the well. Ex. 3 (Buford dep. at 59-60). In fact, when Buford's crew was killing a well, he was "99 percent of the time, going back and forth from the wellhead to the pump, watching pressures." Ex. 3 (Buford dep. at 63).

8

Although the well site operation would shut down at lunch, Buford's crew never left the well site. Buford would sometimes leave to eat lunch, at times with the company man. Ex. 3 (Buford dep. at 52). Buford might also leave the well site if a part or something else were needed; he would call the yard manager for the part and perhaps meet the yard manager halfway. Ex. 3 (Buford dep. at 53-54).

Buford claims that he would sometimes engage in manual work by helping members of his crew. For instance, he claimed that he at times "physically" had to work on a blowout preventer. Ex. 3 (Buford dep. at 113-114). However, when asked if he would have to do "physical or manual labor" to correct pressures in the well, his response was, "It varied on that." Ex. 3 (Buford dep. at 131-132). Buford could "give no percentages" when asked how often he would help others when he saw there was a problem. Ex. 3 (Buford dep. at 116).

When Buford felt the crew's job was done, he would be the one to "call it a day." Ex. 3 (Buford dep. at 80). Once the day's project was done, the crew had to return to the yard, but Buford would go straight home. Ex. 3 (Buford dep. at 68-69). On occasion, Buford would call his crew after work to return to a well site. Ex. 3 (Buford dep. at 69-70).

### 5.   *Buford's role in personnel decisions.*

Although he claimed he could not write up anyone, Buford had a role in personnel decisions. After observing a new crew member doing a job, Buford would put in a recommendation with the yard manager as to whether the crew member "was going to make it or not." Ex. 3 (Buford dep. at 75). The yard manager would

9

also ask in general how crew members were doing.   Ex. 3 (Buford dep. at 76).
Buford's input was important because the yard manager was rarely at the well site.
Ex. 3 (Buford dep. at 116-117); Ex. 5 (Pittman decl.); Ex. 6 (Menchaca decl.).

If a crew member started acting dangerously, Buford claims he could not give
a disciplinary write-up or fire the crew member.   Buford would report on the
situation and let the "chain of command" take over.   Ex. 3 (Buford dep. at 117).
However, he could pull the crew member off the job and get another crew member to
replace him.   Ex. 3 (Buford dep. at 79-80)   In fact, Buford suspected that a member
of his crew was "taking pills" on one occasion:

Q:     You called the yard manager and he said monitor it?

A:     That is correct.

Q:     Did that guy ever come back to your crew?

A:     No.

Q:     Did you ask your yard manager not to put him back on your crew?

A:     No, I told him he wasn't coming back on my crew.

Ex. 3 (Buford dep. at 148).   If Buford saw someone who posed a safety issue, he
could deal with it.   Ex. 3 (Buford dep. at 117-118).


### C.   The 2014 and 2015 downturn in the oil and gas industry led to a slowdown of work for Buford and his crew.

After the oil and gas business experienced a significant slowdown in 2014 and
2015 due to the drop in the price of oil, Buford usually worked five days a week,
although he could not estimate how many days a week he and his crew worked at a

10

well site. Ex. 3 (Buford dep. at 41-43, 54).  On those days Buford and his crew were not at a well site, they would be at the shop. Ex. 3 (Buford dep. at 42).  The crew would clean up the rig and make repairs to the rig; Buford testified he would "be out there with them" and would get them "whatever they needed to repair the rig or such, supplies." Ex. 3 (Buford dep. at 44-45).  There were no pieces of equipment that only he could fix; in other words, his crew could do the work.  Ex. 3 (Buford dep. 150).

On some days during the 2014/2015 time period, Buford's crew would only work in the yard for 2-3 hours before being sent home. Ex. 3 (Buford dep at 57).  Buford would use this time to call customers "looking for a job" -- "any job at the point in time" -- and sometimes call people with whom he had never worked. Ex. 3 (Buford dep at 58).

Buford estimated the Magnolia Yard had seven rig supervisors at one point while business was good; by the time the Magnolia Yard was closed, that number was down to less than four. Ex. 3 (Buford dep. at 37-38); Ex. 5 (Pittman decl.).


**D.**  **The closure of the Magnolia Yard in October 2015 and Buford's company-initiated administrative transfer that was used to continue his company-paid salary and benefits for an extra month.**

Ultimately, the downturn in the oil and gas business led to the shutdown of the Magnolia Yard at the end of October 2015.  Ex. 1 (Hutchinson decl.).  Buford was initially offered an hourly job at the Minden Yard, but he turned it down without ever finding out what it was.  Ex. 3 (Buford dep. at 85-86).  The other

11

individual who filed a consent in this matter (after the discovery deadline), Lance Taylor, was simply laid off at the end of October 2015.   Ex. 4 (Clark decl., attachment A).

Despite Buford's refusal to consider taking another job, Texas CES did not immediately terminate Buford's employment.  Because Buford's wife was seriously ill, Texas CES administratively transferred him to its yard in Minden, Louisiana, so he could continue receiving a salary and family health benefits for an additional month.  Ex. 2 (Hauger decl.); Ex. 4 (Clark decl.).

Buford's actual last day of work was in mid-October 2015.  Ex. 1 (Hutchinson decl.); Ex. 2 (Hauger decl.).   He spent the remaining part of October, all of November and December, and part of January 2016 caring for his terminally ill wife.  She passed away on January 19, 2016.  Ex. 3 (Buford dep at 88); Ex. 7 (Buford's interrogatory responses).

Buford filed this lawsuit on May 12, 2017.

## III.   ARGUMENT

### A.   Summary judgment standards.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. p. 56(c).

1610792-v1

"There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *see also Pruneda v. Xtreme Drilling & Coil Services, Inc.*, No. 5:16-CV-91, 2017 WL 3023214, *7 (W.D. Tex. June 20, 2017) (in an oilfield case, the court held that where employee and employer described duties in a similar fashion, but emphasized different duties, employer had presented sufficient evidence to establish that the employee's primary duty was managerial work; court ultimately found the highly compensated employee exemption applied).

Ultimately, "[e]vidence, not contentions, avoids summary judgment." *Al-Zubaidy v. Tek Industries, Inc.*, 406 F.3d 1030, 1036 (8th Cir. 2005).

## B.   More than one exemption applies to Buford's highly paid supervisory and management role at Texas CES.

Plaintiff's job role and his $100,000+ pay per year make entirely relevant not one, but two exemptions under the FLSA – the highly compensated employee exemption and the executive exemption.  Department of Labor regulations from 2015 and relevant federal court precedent apply.  *See Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 885 (2016) (citing *Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 903 (8th Cir. 2014)).

The U.S. Supreme Court made it clear just days ago that exemptions are not to be "narrowly construed" against employers like Texas CES – instead, they should

13

be given a "fair reading." *Encino Motorcars, LLC. v. Navarro*, No. 16-1362, 584 U.S. ___ (April 2, 2018).

### 1. Buford's role as a rig supervisor falls under the highly compensated employee exemption.

The highly compensated employee exemption applies to those employees with total annual compensation of at least $100,000.00 if a) they are paid at least $455 per week on a salary or fee basis, and b) they *customarily and regularly* perform any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee.[7]   *See* 29 C.F.R. § 541.601(a)-(b) (2015).   Those "one or more" duties could include a) managing a customarily recognized subdivision of Texas CES (his crew) or directing the work of at least two or more employees, *see* 29 C.F.R. §§ 541.100(a)(2)-(3) and 541.601(c) (2015), or b) non-manual work directly related to the management or general business operations of Texas CES or its customers.   *See* 29 C.F.R. § 541.200(a)(2) (2015).   The fact that Buford was performing a combination of exempt executive and administrative duties does not in any way "defeat the exemption under any other section." *See* 29 C.F.R. § 541.708 (2015).

Further, a high level of salaried compensation -- particularly when contrasted with the hourly pay of Buford's four-person crew -- "is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c) (2015). In short, the Court need not

---

[7] The executive or administrative duty that qualifies for purposes of the highly compensated employee exemption need not be Buford's "primary duty." Instead, the duty need only be *customarily and regularly* performed by Buford.

"dive into the weeds" of Buford's duties as a rig supervisor, although his own testimony makes it very clear just what his primary roles were.

### a. *Texas CES paid Buford over $100,000 per year.*

Texas CES paid Buford a salary of at least $455 per week during 2014 and 2015, and in both years, he made over $100,000.00 in salary and other non-discretionary income.  Ex.4 (Clark decl.); Ex. 8 (Buford's responses to requests for production).  Buford meets this element of the highly compensated employee exemption.

### b. *Buford customarily and regularly performed exempt duties – executive and administrative.*

There is no dispute that Buford *customarily and regularly* managed his crew members and in fact directed the work of at least two full-time employees on a daily basis, two of the duties found in the executive exemption.  *See* 29 C.F.R. § 541.601(a) (2015).

Among other things, the definition of "management" includes setting and adjusting rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; planning the work; determining the techniques to be used; and providing for the safety and security of the employees or property. *See* 29 C.F.R. § 541.102.

All four of Buford's crew members were younger than Buford – he said he was too "wore out" to do the jobs his crew did -- and all made considerably less money than Buford.  Ex. 3 (Buford dep. at 47-48); Ex. 4 (Clark decl.).  When his crew was not sure of something, Buford was there to tell the crew what to do or how

15

to do it. Ex. 3 (Buford dep. at 67-68). He was usually the one to "call it a day" at the well site, and had in the past called his crew back to a well site after hours. Ex. 3 (Buford dep. at 69-70, 80). Buford also did paperwork on a daily basis, sometimes for hours. Ex. 3 (Buford dep. at 78). Finally, he considered his most important duty to be the safety of his crew, and would normally be the one to shut down the well site operations if needed. Ex. 3 (Buford dep. at 20, 40, 71-73).

The fact that Buford may have performed manual work at times (or even most of the time) does not change the nature of his supervisory role; nor does it change the fact that he managed his crew on a daily basis. *See Pruneda*, No. 5:16-CV-91, 2017 WL 3023214, *7 (court found that supervisors primarily performed non-manual work because "their primary duty was management and supervision of the crew members, irrespective of the fact that they may have also performed physical labor on the well site."); *Johnson v. Home Team Products, Inc.*, No. 03-2775, 2004 WL 1586552, *6 (E.D. La. July 15, 2004) (plaintiff who led by example supervised his crew while simultaneously performing physical labor more than 50% of the time); *see also* 29 C.F.R. §541.106(a)-(b) (2015) ("Concurrent performance of exempt and non-exempt work does not disqualify an employee from the executive exemption if the requirements of §541.100 are otherwise met. . . . Generally, exempt executives make the decision regarding when to perform non-exempt duties and remain responsible for the success or failure of business operations under their management while performing the non-exempt work."). Buford admittedly was responsible for the success or failure of the well site operations -- if something went

16

wrong at the well site, responsibility fell on him as the rig supervisor.  Ex. 3 (Buford

dep. at 41).

Further, there is no dispute that Buford *customarily and regularly* performed

administrative/non-manual work directly related to the management or general

business operations of Texas CES and Texas CES's customers.[8]  Buford testified

that a) every day he was in the field with his crew, he would conduct safety

meetings and in fact believed his primary duty was the overall safety of his crew

(safety and health); b) every day he was in the field with his crew, he would go over

the project for the day with the crew and served as the "teacher" or "trainer" when

the crew was not sure how to proceed and for new crew members (personnel

management); c) on those occasions when the customer representative was not on-

site, he would handle the customer's other on-site vendors (management or general

business operations of the employer's customers); d) he would ensure the day's

project was completed as required and even call his crew back to work after hours if

needed (quality control and personnel management); e) he would do paperwork

every day -- sometimes for hours -- including completing field tickets that reflected

the hours worked by his crew, the specific work done at the well site, and the cost of

everything done at the well site for the day (human resources, finance and

accounting); and f) when he and his crew were not in the field after the oil and gas

industry took a significant downturn, he would call current and potential customers

looking for additional jobs (marketing).  *See* 29 C.F.R. §541.201(a)-(c) (2015).

---

[8] Buford in fact meets the requirements to be considered exempt under the administrative
exemption.

17

Because Buford *customarily and regularly* performed exempt duties as a rig supervisor, he meets the requirements of the highly compensated exemption. Therefore, his claims under the FLSA and AMWA should be dismissed. *See Carter v. Primary Home Care of Hot Springs, Inc.*, 2015 WL 11120563, at *2 (W.D. Ark. May 14, 2015) ("The FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner.").

### 2. Buford's role as a rig supervisor also falls under the executive exemption.

The executive exemption applies to a supervisor a) who is compensated on a salary basis, b) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision, c) who customarily and regularly directs the work of two or more other employees, and d) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or other change of status of other employees are given particular weight. *See* 29 C.F.R. § 541.100 (2015).

There is no dispute that Buford was compensated on a salary basis, and that he made a salary of at least $455 a week during the relevant time period. There also is no dispute that Buford customarily and regularly directed the work of two or more other employees. *See* Section III.B.1.b above. Therefore, Texas CES need only show that Buford's primary duty was management of a customarily recognized

18

department or subdivision of Texas CES and that his suggestions and recommendations as to the hiring, firing, advancement, promotion or other change of status of other employees are given particular weight.

### a. Buford's primary duty was management of a customarily recognized department or subdivision of Texas CES.

The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.[9]  29 C.F.R. § 541.700(a) (2015).  Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  *Id.*  Even supervisors who spend less than fifty percent of work time doing exempt duties can still qualify for the exemption.  *See* 29 C.F.R. § 541.700(b)-(c) (2015); *see also Thomas v. Speedway SuperAmerica, LLC,* 506 F.3d 496, 499 (6th Cir. 2007) (holding store manager who spent 60% of her time performing non-managerial duties was still exempt); *Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104, 1108-1109, 1114-1115 (9th Cir. 2001) (accepting plaintiffs' assertion that they spent more than 50% of the time on non-exempt manual tasks, yet still

---

[9] Buford consistently testified that his most important duty was the safety of his crew, and that when Texas CES acquired TSWS, the emphasis was on safety and documentation.

finding the exemption applied). "Concurrent performance of exempt and non-exempt work does not disqualify an employee from the executive exemption if the requirements of §541.100 are otherwise met." 29 C.F.R. § 541.106(a) (2015).

Buford was quite clear on what his primary/most important job duties were in his management role at Texas CES – keeping his men safe and documentation.[10] Buford testified that he was the senior man at the well site (his immediate supervisor was rarely on-site), and if something went wrong, he was the one who got in trouble. Ex. 3 (Buford dep. at 41). Buford's salary was significantly higher than that of his crew, in large part because of the crucial role a rig supervisor plays at the well site, Ex. 5 (Pittman decl.), and no one disputes that the four crew members Buford managed were capable of doing the manual labor required at the well site and the yard. Ex. 3 (Buford dep. at 150); Ex. 6 (Menchaca decl.). As Buford put it, he was "too old and wore out" to do the jobs of his crew. Ex. 3 (Buford dep. at 47-48).

Regardless of what other things Buford may have done at the well site, his primary duty as the rig supervisor was the management of his crew – everything from ensuring their safety, to being available to answer questions from his crew, to doing paperwork detailing the jobs done and the hours worked by the individual crew members, and to calling it a day. Therefore, Buford's role as a rig supervisor meets the "primary duty" factor for the executive exemption.

---

[10] "Management" includes training employees; setting and adjusting rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; planning the work; determining the techniques to be used; and providing for the safety and security of the employees or property. *See* 29 C.F.R. § 541.102 (2015). Buford testified he did all of these things (apart from setting pay) as a rig supervisor.

> ***b. Buford's recommendations as to the hiring,***
> ***firing, advancement, promotion or other change***
> ***of status of other employees were necessarily***
> ***given particular weight because he was the***
> ***senior man for Texas CES at the well site.***

Finally, Buford's own testimony makes it clear that his suggestions and recommendations as to the hiring, firing, advancement, promotion <u>or</u> other change of status of other employees was given particular weight by his supervisor. Factors that are relevant to whether a person's suggestions and recommendations are given "particular weight" when dealing with hiring, firing, advancement, promotion or other changes in personnel status for those supervised include:

> . . . whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.
>
> . . .
>
> An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.05 (2015).

Although he testified he had a really good crew with little turnover, Buford would put in a recommendation with the yard manager as to whether a new crew member "was going to make it or not." Ex. 3 (Buford dep. at 75). Because yard managers rarely came to the well site, a rig supervisor's input was important. Ex. 6 (Menchaca decl.). Buford's yard manager also would ask in general how his crew members were doing. Ex.3 (Buford dep. at 76, 116-117). Importantly, when safety

issues arose, Buford could pull a crew member off the job and get another crew member to replace him.   Ex. 3 (Buford dep. at 79-80, 117-118).   In fact, Buford at one point told his yard manager that a suspect crew member "wasn't coming back on my crew."   Ex. 3 (Buford dep. at 148).

The fact that Buford had a limited need to comment on his crew does not erase the fact that when he did make recommendations, they were listened to by the yard manager.   *See Garrison*, 833 F.3d at 885-886 (affirming summary judgment to employer and holding team leaders at plant were exempt executives because plaintiffs were involved "in at least one personnel decision, if not more"; many different employee duties and levels of involvement can work to satisfy the fourth element).   Therefore, Buford's role meets the "particular weight" factor for purposes of the executive exemption.

The Court should find that Buford's role at Texas CES as a rig supervisor meets the requirements of the executive exemption.

C.   **Buford's FMLA claim fails because he was not an "eligible employee" and because he would have lost his job regardless of whether he sought FMLA leave due to the Magnolia Yard closing.**

1. *Buford was not an "eligible employee" under the FMLA.*

An "eligible employee" is an individual employed for at least twelve months and for at least 1,250 hours of service during the previous twelve-month period. 29 U.S.C. § 2611(2).   The term "eligible employee" excludes an employee who is employed at a worksite at which fewer than fifty people work within a seventy-five

22

mile radius. 29 U.S.C. § 2611(2)(B)((ii); 29 C.F.R. § 825.102 (2015).  As of October 2015, only one yard was within seventy-five miles of the Magnolia Yard, and the total number of employees in both yards was less than fifty.  Ex. 4 (Clark decl.). Therefore, Buford was not an "eligible employee" for purposes of FMLA leave, and his FMLA claims should be dismissed.

### 2. Even if eligible, Buford would have lost his job due to the closing of the Magnolia Yard.

In the complaint, Buford alleges that his wife was diagnosed with lung cancer in April 2015 and that he notified Texas CES on October 21, 2015, that he needed to take FMLA leave to care for his wife.  Buford goes on to allege that, before he could submit his FMLA paperwork, Texas CES told him that he was "laid off and could choose to be demoted to an inferior position," but that he "declined to take the demotion." *Id.* at 8–9.  Buford claims that these actions violated his rights under the FMLA.

The FMLA provides "eligible employees" with certain leave rights and the right to restoration to the same (or an equivalent) job position upon completion of the leave. *See* 29 U.S.C. § 2614(a)(1)(A).  "Taking FMLA leave, however, does not give an employee any greater protection against termination for reasons unrelated to the FMLA than was available before." *Malloy v. U.S. Postal Serv.*, 756 F.3d 1088, 1090 (8th Cir. 2014); *see also* 29 U.S.C. § 2614(a)(3)(B) and 29 C.F.R. § 825.216(a) (2015) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed

23

during the FMLA leave period."). Thus, "the FMLA does not require an employer to retain an employee on FMLA leave if that employee has no right to return to work." *Throneberry v. McGehee Desha Cty. Hosp.*, 403 F.3d 972, 978 (8th Cir. 2005). Accordingly, "if an employer were authorized to discharge an employee if the employee were not on FMLA leave, the FMLA does not shield an employee on FMLA leave from the same, lawful discharge." *Id.*

That is the situation here. Even if Buford had taken leave in October 2015, he had no right to return to work because the worksite where he had been working was shut down altogether. There is no dispute that Texas CES closed down the Magnolia Yard where Buford worked as of October 2015 because of a significant downturn in the oil industry. Texas CES was authorized to terminate all of the positions at the Magnolia Yard based on this closure, and Buford had no leave or job-restoration rights under the FMLA that could be violated by Texas CES. In fact, the Eighth Circuit has commented that holding an employer strictly liable under the FMLA for terminating an employee on leave because the employer went out of business would be preposterous. *See Throneberry*, 403 F.3d at 980.

Because Texas CES closed the Magnolia Yard where Buford worked and eliminated Buford's job position, he had no leave or job-restoration rights under the FMLA. Thus, Buford's FMLA claim should be dismissed.

### D. <u>Texas CES is the only proper defendant in this matter; Superior and Complete should be dismissed.</u>

The FLSA, AMWA, and FMLA provide a cause of action only against an "employer" as that term is defined by each statute. *See* 29 U.S.C. §§ 216(b), 2617(a);

24

Ark. Code Ann. § 11-4-218(a), (e). The FLSA, AMWA, and FMLA similarly define "employer" as, among other things, any person or entity that acts directly or indirectly in the interest of an employer in relation to an employee. *See* 29 U.S.C. §§ 203(a), (d), 2611(4)(A)(ii)(I), (8); Ark. Code Ann. § 11-4-203(4). It is a plaintiff's burden to prove the existence of an employer-employee relationship. *See Specht v. City of Sioux Falls*, 639 F.3d 814, 819 (8th Cir. 2011).[11]

All parties agree that Texas CES is Buford's employer. The issue is simply whether the other two defendants are also his employer. In fact, they are not. For the reasons discussed in the defendants' pending motion for judgment on the pleadings, ECF Doc. 15, and based on the declarations and deposition testimony attached to this motion, Superior and Complete should be dismissed from this case.

## IV.   CONCLUSION.

Buford's role as a rig supervisor at Texas CES was exempt under both the highly compensated employee exemption and the executive exemption – he made over $100,000.00 in 2013, 2014 and 2015 (despite the fact that he did no work for Texas CES after late October 2015), and customarily and regularly performed several duties under the executive and administrative exemptions. Further, Buford was not eligible for FMLA leave and not otherwise entitled to his job after the shutdown of the entire Magnolia Yard at the end of October 2015, even though

---

[11] Cases addressing the FLSA apply with equal force to Buford's AMWA and FMLA claims. *See Darby v. Bratch*, 287 F.3d 673, 680–81 (8th Cir. 2002) (courts often refer to FLSA cases for guidance and interpretation of the FMLA's "very similar" definition of employer); *Carter*, 2015 WL 11120563, at *2 ("The FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner.").

1610792-v1

Texas CES administratively transferred him to another yard in order to extend both his salary and benefits through the end of November.  Therefore, the Court should dismiss Buford's FLSA, AMWA and FMLA claims.

> WRIGHT, LINDSEY & JENNINGS LLP
> 200 West Capitol Avenue, Suite 2300
> Little Rock, Arkansas 72201-3699
> (501) 371-0808
> FAX: (501) 376-9442
> E-MAIL:  wjackson@wlj.com
>                   jkim@wlj.com
>                   nesmaeilpour@wlj.com


> By _____
>        William Stuart Jackson (92189)
>        Jane A. Kim (2007160)
>        Neemah A. Esmaeilpour (2012229)
>        *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

> Josh Sanford – josh@sanfordlawfirm.com
> Christopher Burks – chris@sanfordlawfirm.com

*Attorneys for Plaintiff*

> _____
> Stuart Jackson