# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**RAYMOND BUFORD, individually and on
behalf of others similarly situated**                         **PLAINTIFF**

**v.**                         **Case No. 4:17-cv-00323-KGB**

**SUPERIOR ENERGY SERVICES, LLC,
COMPLETE ENERGY SERVICES, INC.,
and TEXAS CES, INC., d/b/a SPN WELL
SERVICES a/k/a MERCER WELL
SERVICES**                         **DEFENDANTS**

## OPINION AND ORDER

Plaintiff Raymond Buford, individually and on behalf of others similarly situated, brings this action against his former employer, defendant Texas CES, Inc., d/b/a SPN Well Services a/k/a Mercer Well Services ("Texas CES")[1], alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Arkansas Minimum Wage Act ("AMWA"), Ark. Code Ann. § 11-4-201, *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Before the Court is Texas CES's motion for summary judgment (Dkt. No. 30). Mr. Buford has responded in opposition (Dkt. No. 38). Texas CES has replied (Dkt. No. 43). For the following reasons, the Court denies Texas CES's motion for summary judgment as to Mr. Buford's FLSA and AMWA claims and grants the motion as to Mr. Buford's FMLA claim (Dkt. No. 30).

---

[1] Mr. Buford also named as defendants Superior Energy Services, LLC ("Superior"), and Complete Energy Services, Inc. ("Complete"). By prior Order, this Court granted defendants' motion for judgment on the pleadings and dismissed pursuant to Federal Rule of Civil Procedure 12(c) Mr. Buford's claims against separate defendants Superior and Complete.

## I. Factual Background

Unless otherwise noted, the following facts are taken from Texas CES's statement of undisputed material facts and Mr. Buford's response to Texas CES's statement of undisputed material facts (Dkt. Nos. 33, 39).

Texas CES provides services to oil and gas operations from the "birth" of a well, through maintenance and restoration of a well, to the "plug" and abandonment of a well (Dkt. No. 33, ¶ 1). Texas CES' only Arkansas-based operation was its Magnolia Yard located in Magnolia, Arkansas (*Id*., ¶ 2). Magnolia Yard was acquired by Texas CES in 2008 when Texas CES purchased Therral Story Well Services ("TSWS") (*Id*.). TSWS and Mercer Well Services are both d/b/a's of Texas CES (*Id*., ¶ 4). Texas CES is a subsidiary of Superior Energy Services-North America, Inc. (*Id*.).

Mr. Buford began working for TSWS in the early 1990's as a derrickhand (*Id*., ¶¶ 3, 5). TSWS promoted Mr. Buford to rig operator and eventually to rig supervisor prior to TSWS being acquired by Texas CES in 2008 (Dkt. No. 33, ¶ 3). After the 2008 acquisition by Texas CES, Mr. Buford worked mostly out of the Magnolia Yard (*Id.*, ¶ 11). According to Mr. Buford's daily field tickets—documentation he filled out detailing, among other things, the names of the crew members and the hours they worked, well site locations, and the work performed at the well—Mr. Buford and his crew operated in parts of Arkansas and Louisiana from May 2014 until he left Texas CES in October 2015 (*Id.*, ¶ 12).

Mr. Buford worked with a crew of four members. The four crew members included two floorhands who did manual work on the well itself, a derrickhand who "goes up the derrick" above the well and uses a tubing/rod elevator to latch onto tubing or rods coming out of or going into the well, and a rig operator who moves the rig to the location and attaches it to the well (*Id*., ¶ 17).

The rig operator "runs the rig" (*Id.*).  The rig is a mobile derrick that backs up over the well (*Id.*, ¶ 18).

TSWS paid rig supervisors on a salary basis and Texas CES continued this practice when it acquired TSWS (Dkt. No. 33, ¶ 6).  Texas CES did not change anything about employee pay or benefits when it acquired TSWS (*Id.*, ¶ 7).  During each of the last three years of his employment with Texas CES, Mr. Buford made over $100,000.00 and his base salary exceeded $455.00 per week (*Id.*, ¶ 8).  The members of Mr. Buford's crew were all hourly workers (*Id.*, ¶ 9).  Floorhands earned $16.00 per hour, derrickhands earned $17.50 per hour, and rig workers earned $19.00 to $20.00 per hour (*Id.*).  Texas CES contends that the crew members made less money than Mr. Buford (*Id.*, ¶ 9).  Mr. Buford does not deny the hourly rate for each of these positions; however, he submits that hourly employees received overtime premiums leading to a total annual compensation more in line with the pay Mr. Buford received (Dkt. No. 39, ¶ 9).

The parties dispute Mr. Buford's role as a member of the oil rig crew.  Texas CES contends that Mr. Buford supervised the crew, was the senior person on site for Texas CES, and that Mr. Buford's role was to keep his crew pointed in the right direction (Dkt. No. 33, ¶¶ 13, 16, 19).  Texas CES further contends that it viewed Mr. Buford's role as a rig supervisor as crucial because he managed the crew and was the senior person on-site who dealt with the customer's representative or company man (*Id.*, ¶ 10).  Texas CES contends that the yard manager came to the well site "once in a while" and that the yard manager's presence at the well site was infrequent and short (*Id.*, ¶ 15).

Mr. Buford denies that he managed or was somehow in charge of a crew (Dkt. No. 39, ¶ 12, 20).  He states that he did not have any managerial duties over the crew (*Id.,* ¶¶ 12, 19, 20).  He submits instead that "everybody took care of everybody. . . we all worked together" (*Id.*, ¶ 10).

Mr. Buford stated that he had a "great crew" with very little turnover and he could "count on them" to do their jobs (Dkt. No. 33, ¶ 21). The parties agree that Mr. Buford only worked with one crew at a time—he would not have one crew at one well site and another crew at another well site (*Id.,* ¶ 20).

Texas CES submits that Mr. Buford described well site work as a chain of command (*Id.*, ¶ 22). Mr. Buford submits that the entire internal structure of Texas CES was a chain of command (Dkt. No. 39, ¶ 22). Texas CES contends that Mr. Buford was necessary when someone needed to tell the crew what to do or how to do it (Dkt. No. 33, ¶ 24). It contends that, when the crew was not sure of something, Mr. Buford stepped in and was usually "standing right there with them before they asked the question" (*Id.*, ¶ 23). Mr. Buford submits instead that he never had to answer questions from the crew because they were experienced and because they all worked together to resolve issues before a question arose (Dkt. No. 39, ¶ 23). Mr. Buford asserts that the crew worked together and that everybody was responsible for everybody else (*Id.*, ¶ 24).

Mr. Buford admits that his crew was always younger than he was and that he could not have gone back to being a derrickhand, a floorhand, or even a rig operator because he was "too old and wore out" for those jobs (Dkt. No. 33, ¶ 25). Texas CES submits that Mr. Buford, as the senior man at the well site, had overall responsibility on behalf of Texas CES (*Id.*, ¶ 29). Mr. Buford denies having overall responsibility but admits that, if something went wrong at the well site, he was the one who got into trouble (Dkt. No. 39, ¶ 29). Mr. Buford stated that a person could not just walk off the street and be a rig operator, much less a rig supervisor, because "[y]ou learn a bunch of stuff" (Dkt. No. 33, ¶ 30). Mr. Buford denies receiving any specialized training other than on the job training to perform his job duties (Dkt. No. 39, ¶ 30).

Mr. Buford had triple bypass surgery in 2010 and was out for several weeks (Dkt. No. 33, ¶ 26). After returning to work, Mr. Buford was limited in the amount of physical activity he could perform (*Id*., ¶ 27). As Mr. Buford put it, "You just couldn't overbear yourself," and "I had to figure out my limitations" (*Id*., ¶ 27). According to Mr. Buford, his crew helped pick up the slack for him after his return (*Id*., ¶ 28).

Mr. Buford stated that, when Texas CES acquired TSWS, the transition was like going from a "mom-and-pop" operation to a "big corporate" operation (*Id*., ¶ 31). Following the acquisition, there was an increased emphasis on both safety and documentation, which became a daily focus (*Id*., ¶¶ 32, 33). Part of being a rig supervisor for Texas CES included attending mandatory internal training sessions—H2S classes, well control school, and safety training (Dkt. No. 33, ¶ 34). As rig supervisor, Mr. Buford's daily paperwork sometimes took longer than two hours to complete (*Id*., ¶ 40). In addition to filling out daily safety documentation, Mr. Buford filled out daily field tickets that detailed the specific work done at the well site, the cost of everything done at the well site for the day—including pipe tallies, rod and tubing counts, and the calculation of the amount of fluid used—and the specific hours worked by Mr. Buford's crew (*Id*., ¶ 41). Texas CES submits that it was Mr. Buford's responsibility to ensure each member of his crew signed off on the number of hours worked each day (*Id*., ¶ 42). Mr. Buford denies that it was his responsibility to get signatures; he submits that the crew and the company man also signed off on field tickets (Dkt. No. 39, ¶ 42).

Mr. Buford described the safety of his crew as the most important duty he had as the rig supervisor—"making sure his hands go home the way came" with "all of their fingers and toes" was Mr. Buford's main goal each day (Dkt. No. 33, ¶ 35). Mr. Buford also stated that all crewmembers were tasked with the safety of the well (Dkt. No. 39, ¶ 35). Texas CES contends

that Mr. Buford had an overarching safety role which included running and documenting the initial safety meeting on-site every morning (Dkt. No. 33, ¶ 36). Mr. Buford admits documenting the meetings but denies running the meetings (Dkt. No. 39, ¶ 36). Mr. Buford would shut down well site operations if he felt his crew needed a break due to the heat or if he felt they were "breathing too much of that gas" from the well (Dkt. No. 33, ¶ 37). Any of his crew could shut things down, but in practice, it was Mr. Buford who normally shut down the well site if needed (*Id.*, ¶ 38).

Texas CES submits that other important jobs of a rig supervisor were: to make sure the crew showed up; to be a teacher or trainer for members of the crew that needed training; to ensure the right equipment from Texas CES was at the site; to ensure the overall job was accomplished for Texas CES; to talk to customers on-site as the "company man" and to get instructions for the day; and to take care of whatever needed to be done in the company man's absence (*Id.*, ¶ 43). Mr. Buford denies this and submits instead that he never had to ensure the crew showed up and that everybody on the crew was responsible for training everybody else (Dkt. No. 39, ¶ 43). As rig supervisor, Mr. Buford would "take care of the company man's business while he went off to take care of more business" which could include dealing with other vendors or companies coming on the well site, including "water trucks, pipe trucks coming in with rods, tubing, going out with rods and tubing, all such as that" (Dkt. No. 33, ¶ 44). Overall, Mr. Buford had a "bigger load" in terms of responsibilities as a rig supervisor at Texas CES compared to TSWS, despite the fact that he still had the same number of people—an operator, a derrickhand, and two floorhands—working on the rig for him (*Id.*, ¶ 45). Mr. Buford contends that oilfield work in general required more responsibilities and paperwork by the time Texas CES acquired TSWS (Dkt. No. 39, ¶ 45).

Mr. Buford and his crew would travel to the well site in two trucks (Dkt. No. 33, ¶ 46). Mr. Buford would travel in one truck by himself and take the truck home at night (*Id.*). The rest

of the crew would be in another truck driven by the rig operator. Both trucks would be used to haul equipment, tools, and supplies to the well site (*Id*.). A typical day for Mr. Buford and his crew included meeting at the yard, getting any needed supplies, traveling to the well location, having the daily safety meeting, discussing what was going to be done that day, opening the well, relieving any pressure, and killing the well if necessary (*Id*., ¶ 47). Mr. Buford admits that these tasks were required to be done to start the day but that the rest of the day included completion work, workovers, rod and tube swabbing (Dkt. No. 39, ¶ 47). Mr. Buford contends that he primarily worked with rod and tubing (*Id*.).

When Mr. Buford's crew was setting up for a job, his role in the rigging-up process was to "see that it's done properly" (Dkt. No. 33, ¶ 48). Mr. Buford's job also included monitoring the pressures within the well (*Id*.). Mr. Buford contends that, in addition to those tasks, he "repaired broken equipment, helped rig up the equipment, and set up, repaired, and adjusted blowout preventers" (Dkt. No. 39, ¶ 49). When Mr. Buford's crew was killing a well, he was "99 percent of the time, going back and forth from the wellhead to the pump, watching pressures" (Dkt. No. 33, ¶ 49). Although the well site operation would shut down at lunch, Mr. Buford's crew never left the well site (*Id*., ¶ 50). Mr. Buford would sometimes leave to eat lunch with the company man (*Id*., ¶ 51). Mr. Buford occasionally left the well site to retrieve parts the crew needed; he would call the yard manager for the part and meet the yard manager halfway (*Id*., ¶ 52). Mr. Buford submits that only rarely did he leave the well site for lunch or if parts needed to be picked up. He denies that it was his exclusive responsibility to leave the well site in order to pick up needed parts (Dkt. No. 39, ¶ 52). When asked if he would have to do "physical or manual labor" to correct pressures in the well, Mr. Buford's response was, "It varied on that." (Dkt. No. 33, ¶ 53).

Mr. Buford could "give no percentages" when asked how often he would help others when he saw there was a problem (*Id.*, ¶ 54). When Mr. Buford felt the crew's job was done, he would be the one to "call it a day" (*Id.*, ¶ 55). Texas CES contends that once a day's project was done, the crew had to return to the yard but Mr. Buford would go straight home (*Id.*, ¶ 56). Mr. Buford denies this and submits that he returned to the yard with his crew to unload the equipment before going home (Dkt. No. 39, ¶ 56). On occasion, Mr. Buford would call his crew after work to return to a well site (Dkt. No. 33, ¶ 57).

Texas CES submits that Mr. Buford had a role in personnel decisions. Texas CES contends that, after observing a new crew member doing a job, Mr. Buford would put in a recommendation with the yard manager as to whether the crew member "was going to make it or not" (Dkt. No. 33, ¶ 58). Mr. Buford denies this and submits that he had no role in who was hired or fired, promoted or demoted, or how other crew members were paid (Dkt. No. 39, ¶ 58). The yard manager would ask Mr. Buford in general how crew members were doing (Dkt. No. 33, ¶ 59). Texas CES contends that Mr. Buford's input was important because the yard manager was rarely at the well site (*Id.*, ¶ 60). Mr. Buford denies this (Dkt. No. 39, ¶ 60).

Texas CES contends that, if a crew member started acting dangerously, Mr. Buford would report on the situation and let the "chain of command" take over (Dkt. No. 33, ¶ 61). Mr. Buford submits that the rest of the crew had the same responsibility (Dkt. No. 39, ¶ 61). Texas CES contends that Mr. Buford could pull the crew member off the job and get another crew member to replace him (Dkt. No. 33, ¶ 62). Mr. Buford admits that was technically possible but denies having ever done so (Dkt. No. 39, ¶ 62). Texas CES contends that if Mr. Buford saw someone who posed a safety issue, he could handle the situation (Dkt. No. 33, ¶ 64). Texas CES points out that, on one occasion, Mr. Buford suspected that a member of his crew was "taking pills" and "told [the yard

manager] he wasn't coming back to my crew" (Dkt. No. 33, ¶ 63). Mr. Buford submits that he was required to inform the yard manager of any suspicions of unsafe behavior and was told to "monitor" the situation (Dkt. No. 39, ¶ 63). Mr. Buford submits that other crewmembers could also make reports about unsafe behavior (*Id*., ¶ 64).

After the oil and gas business experienced a significant slowdown in 2014 and 2015 due to a drop in the price of oil, Mr. Buford usually worked five days a week, although he could not estimate how many days a week he and his crew worked at a well site (Dkt. No. 33, ¶ 65). On the days that Mr. Buford and his crew were not at a well site, they would be at the shop (*Id*., ¶ 66). The crew would clean up the rig and make repairs to the rig; Mr. Buford would "be out there with them" and would get them "whatever they needed to repair the rig or such, supplies" (*Id*., ¶ 67). Mr. Buford submits that he was included in the clean-up and repair of the rig as needed (Dkt. No. 39, ¶ 67). There were no pieces of equipment that only Mr. Buford could fix; his crew could do the work (Dkt. No. 33, ¶ 68). On some days during the 2014-2015 time period, Mr. Buford's crew would only work in the yard for two to three hours before being sent home (*Id*., ¶ 69). Mr. Buford would use this time to call customers "looking for a job" and sometimes call people with whom he had never worked (*Id*., ¶ 70).

Mr. Buford estimated that the Magnolia Yard had seven rig supervisors at one point while business was good; by the time the Magnolia Yard was closed, that number was down to less than four (*Id*., ¶ 71). The downturn in the oil and gas business led to the shutdown of the Magnolia Yard at the end of October 2015 (*Id*., ¶ 72). Texas CES states that Mr. Buford was initially offered an hourly job at the Minden Yard in Louisiana but that he turned it down without ever finding out what it was (*Id*., ¶ 73). Texas CES contends that, despite Mr. Buford's refusal to consider taking another job, Texas CES did not immediately terminate Mr. Buford's employment. Because Mr.

Buford's wife was seriously ill, Texas CES administratively transferred him to its yard in Minden, Louisiana, so that he could continue receiving a salary and family health benefits for an additional month (Dkt. No. 33, ¶ 75).

Mr. Buford submits that the day he requested FMLA leave, he was given the choice of accepting an hourly position at the Minden Yard or being laid off (Dkt. No. 39, ¶¶ 73, 75). He contends that, after an argument with the area supervisor—Tom Hutchinson, he was permitted to use his accrued vacation time through November 2015 (*Id.*, ¶ 75). Mr. Buford's actual last day of work was in in mid-October 2015 (Dkt. No. 33, ¶ 76). Mr. Buford spent the remaining part of October 2015, all of November and December 2015, and part of January 2016 caring for his terminally ill wife. She passed away on January 19, 2016 (*Id.*, ¶ 77).

Mr. Buford filed his collective action complaint on May 12, 2017. He alleges that defendants failed to pay him and others similarly situated as field supervisors overtime compensation in violation of the FLSA and the AMWA. Mr. Buford brings an individual claim for alleged violations of the FMLA.

## II.     Legal Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest

merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III.    Discussion

At issue in this case is whether Mr. Buford falls into one of the categories that exempt him from the overtime payment requirements of the FLSA. Texas CES argues that Mr. Buford's overtime claims under the FLSA and AMWA fail because Mr. Buford's position as rig supervisor was exempt under both the "highly compensated employee exemption" and the "executive exemption" to the FLSA (Dkt. No. 30, ¶ 5). Texas CES further argues that Mr. Buford's claim under the FMLA should be dismissed because he was not eligible for FMLA leave and not entitled to his job after the shutdown of the Magnolia Yard (*Id.*). Texas CES moves for summary judgment on all of Mr. Buford's claims.

### A.    FLSA And AMWA Exempt Status

The FLSA and AMWA generally require employers to pay employees a minimum wage for all hours worked and to pay covered employees overtime for working more than 40 hours in a week. 29 U.S.C. §§ 206(a), 207(a); Ark. Code Ann. §§ 11-4-210(a), 11-4-211(a). The FLSA exempts many categories of employees from this requirement. 29 U.S.C. §213; *see also Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1138 (2018). The FLSA exempts highly compensated employees who customarily and regularly perform any of the exempt duties or

responsibilities of an executive, administrative, or professional employee. 29 C.F.R. § 541.601. The FLSA additionally exempts from the overtime pay requirement any employee employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C. § 213(a). As a general rule, "the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof." *Hertz v. Woodbury Cnty., Iowa,* 566 F.3d 775, 783 (8th Cir. 2009) (quoting *Corning Glass Works v. Brennan,* 417 U.S. 188, 196-97, (1974)). "Disputes regarding the nature of an employee's duties are questions of fact, but the ultimate question whether an employee is exempt under the FLSA is an issue of law." *Jarrett v. ERC Properties, Inc*., 211 F.3d 1078, 1081 (8th Cir. 2000) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

The Supreme Court recently rejected the principle that exemptions should be construed narrowly when interpreting the FLSA. "Because the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give [them] anything other than a fair (rather than a narrow) interpretation." *Encino Motorcars,* 138 S. Ct. at 1142 (internal citation and quotation omitted). The Eighth Circuit Court of Appeals has stated that it finds instructive the Office of Personnel Management regulation requiring that "the designation of an employee as FLSA exempt or nonexempt must ultimately rest on the duties actually performed by the employee." *Madden v. Lumbar One Home Center, Inc.*, 745 F.3d 899, 903 (8th Cir. 2014) (quoting 5 C.F.R. § 551.202(e)). Job titles are not determinative; rather, it is the employee's salary and primary duties that determine his qualification as an exempt employee. 29 C.F.R. §§ 541.2, 541.700(a).

### 1.    Highly Compensated Employee Exemption

FLSA regulations exempt "highly compensated employees," defined as employees who have "total annual compensation of at least $100,000.[00]" and who "customarily and regularly perform[ ] any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee." 29 C.F.R. § 541.601(a).  Mr. Buford does not dispute that he received a total annual compensation of at least $100,000.00 (Dkt. No. 38, at 5).   A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties.  29 C.F.R § 541.601.  However, the exemption does not apply if an employee's primary duty is manual labor, even if the employee customarily and regularly performs the duties or responsibilities of an executive, administrative, or professional employee.  29 C.F.R. § 541.601(d).

Before determining whether Mr. Buford performs any duties that exempt him under § 541.601(a), the Court must determine whether the exemption applies in the first place.  The amount of time Mr. Buford spent performing certain job duties and responsibilities, the importance of those duties and responsibilities, credibility determinations, and the weighing of the evidence are all fact questions for a fact finder.  *Grage v. No. States Power Co. Minn.*, 813 F.3d 1051, 1054 (8th Cir. 2015) (collecting cases).  Nonetheless, whether an employee's particular activities exempt him from the FLSA overtime requirements is a question of law.  *Id.*

An employee's primary duty is "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Manual labor is work involving physical skill and energy and repetitive operations with the hands.  29 C.F.R. § 541.3(a).  The skills and knowledge required for the performance of manual labor are acquired through apprenticeships and on-the-job training, rather than a prolonged course of study like one a lawyer or doctor would complete.  *Id.*

Specific examples of those who primarily perform manual labor are carpenters, electricians, mechanics, plumbers, iron workers, operating engineers, longshoremen, and construction workers. *Id.* These workers are not exempt under the FLSA "no matter how highly paid they might be." *Id.*

Other courts have struggled to classify the work of oil field workers as primarily manual labor. *See Galvin v. FTS Int'l Servs., LLC*, Case No. 7:16cv147-LG-DC, 2017 WL 3012651 at *3 (W.D. Texas June 7, 2017) (explaining that neither Congress nor the Fifth Circuit has determined whether oil field workers are manual laborers) (collecting cases)). Courts in the Eighth Circuit are no different. *See McClendon v. Schlumberger Tech. Corp.*, Case No. 4:15cv00752 JLH, 2017 WL 3821677, at *3 (E.D. Ark. 2017). Whether an oilfield worker's primary duty is manual labor must be determined based on the facts in each case, with major emphasis on the character of the employee's job as a whole. *See Grage,* 813 F.3d at 1055.

The following factors are relevant in determining an employee's primary duty: "relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed." *Id.* (quoting 29 C.F.R. § 541.700(a)). Furthermore, manual labor may be considered exempt if it is performed incidentally to non-manual labor. "Work that is 'directly and closely related' to the performance of exempt work is also considered exempt work." 29 C.F.R. § 541.703(a). "The phrase 'directly and closely related' means tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work." *Id.* Employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. 29 C.F.R. § 541.700(b). However, "[t]ime alone, . . . is not the sole

test, and nothing in [the FLSA] requires that exempt employees spend more than 50 percent of their time performing exempt work." *Id.*

Texas CES submits that the executive or administrative duty that qualifies for purposes of the highly compensated employee exemption need not be Mr. Buford's primary duty. Instead, the duty need only be customarily and regularly performed by Mr. Buford (Dkt. No. 31, at 14 n.7). The Court disagrees. The regulations are clear that the exemption does not apply if an employee's primary duty is manual labor, even if the employee customarily and regularly performs the duties or responsibilities of an executive, administrative, or professional employee. 29 C.F.R. § 541.601(d). The Court must determine first if Mr. Buford's primary duty was manual labor.

Texas CES argues that, as supervisor, Mr. Buford's primary duty was non-manual labor. Texas CES submits that the job of a rig supervisor was to organize the schedule, order supplies, ensure that the crew complied with safety procedures and properly maintained the equipment, and record the crew's time worked and type of work performed at the different well sites (Dkt. No. 30-1, ¶ 6). It contends that the job of a rig supervisor was to "step back and watch the four-man crew and keep them pointed in the right direction." (*Id.*).

Texas CES supports its position with Mr. Buford's deposition testimony, wherein Mr. Buford stated that: (1) his most important job was to get his crew home safely each night; (2) he was the most senior person on site for Texas CES; (3) it was his job to make sure the right equipment was on site; (4) he was a teacher or trainer for members of the crew who needed training; (5) he could tell his crew if they needed to do something when the crew was unsure of how to proceed; (6) he was "too old and wore out" to do the jobs of his four person crew; (7) he would shut down the well site if he felt the crew needed a break; (8) his daily paperwork sometimes took longer than two hours to complete; (9) he would "take care of the company man's business"

when the company man was not present at the well site; and (10) his role at the well site was to get the job done.  (Dkt. No. 43, at 2-3).  Texas CES submits that Mr. Buford performed hours of paperwork every day including completing field tickets (Dkt. No. 31, at 17).  They submit that, when Mr. Buford and his crew were not in the field after the downturn of the oil and gas industry, Mr. Buford would spend time calling current and potential customers in search of additional work (*Id*.).  Texas CES argues that the fact that Mr. Buford performed manual labor "at times (or even most of the time)" does not change the nature of his supervisory role with respect to his crew (Dkt. No. 31, at 16).  They argue that the fact that Mr. Buford performed some manual non-exempt labor does not disqualify him from being exempt as an executive employee (*Id*.).  Texas CES argues that, regardless of what other work Mr. Buford may have done at the well site, his primary duty as the rig supervisor was the management of his crew (*Id.,* at 20).

In response, Mr. Buford argues that his work was almost exclusively manual in nature and that his primary duties were outdoor work involving hand tools and drilling equipment (Dkt. No. 38, at 1).  Mr. Buford contends that his primary job duty was to travel to well sites to "rig up and operate oil wells" and that his primary responsibility was to operate safely wells (*Id*., at 2).  He submits that he regularly performed the duties of other crew members and that the crew was required to remain on the well site all day.  He submits that of the 12 hours or more a day spent at the well site, he spent only a few hours completing paperwork (*Id*.).  Mr. Buford argues that the Court should not rely on the declarations submitted by Texas CES as none of those individuals ever saw Mr. Buford at work and in the performance of his job duties (*Id*., at 3).

Mr. Buford stated that his primary responsibility was "making sure [his] crew went home with all their fingers and toes" (Dkt. No. 33, ¶ 35).  However, it is unclear to the Court if that required Mr. Buford to perform primarily manual labor.  He admits that when Texas CES acquired

TSWS, he took on a "bigger load," which included additional documentation (*Id*., at 45). He admits that he interacted with contractors at the well sites, such as "water trucks, pipe trucks, trucks coming in with rods, tubing, going out with rods and tubing" (*Id*., at 45). However, Mr. Buford also stated in his deposition that he was not solely responsible for training the crew and that "everybody took care of everybody" (Dkt. No. 30-3, at 19). In describing a typical day at a well site, Mr. Buford stated that he and his crew "show up at the yard, get our ice water, supplies, go to the well location; hold our little safety meeting, discuss what is going to be done for the day; open up the well, relieve any pressure, if any, or whatever the case may be; kill the well, if necessary, and start doing our tasks for the day." (*Id*., at 38). When asked who specifically opened up the well, or who released pressure from the well, Mr. Buford responded that there was no specific member of the crew responsible for that and that "we all worked together" (*Id*.). Mr. Buford stated that he could not repair oil wells without manual labor (*Id*., at 79). He stated that he worked outside in the field, that he fixed broken equipment, that he physically worked on blowout preventers as part of his job, and that he could not have done what he was paid to do without manual labor (Dkt. No. 30-3, at 79-81).

The Court cannot grant summary judgment on the record before it. A genuine issue of material fact exists as to what job duties Mr. Buford actually performed on a daily basis which may have rendered him exempt from overtime pay under the FLSA's highly-compensated employee exception. The parties describe many of Mr. Buford's various tasks as hands-on labor and many as not. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part. 29 C.F.R. § 541.2. Texas CES has failed to meet its burden. For these reasons, the

Court denies Texas CES's motion for summary judgment as to Mr. Buford's exempt status under the highly compensated employee exemption.

### 2.    Executive Exemption

Texas CES next contends that Mr. Buford is exempt from overtime requirements under the FLSA because he falls into the executive exemption. The Court determines whether an employee meets the requirements for the executive exemption by applying Department of Labor regulations. The pertinent regulation provides that an "employee employed in a bona fide executive capacity" means any employee

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . , exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).[2]  The Arkansas Department of Labor has generally adopted this test for the AMWA. *See* Ark. Code R. 010.14.1-106(B)(1)(a) ("For the purpose of defining and delimiting

---

[2]  The Court notes that certain subsections of 29 C.F.R. § 541 have been recently amended by the Department of Labor's Final Rule described at 81 Fed. Reg. 32, 39. The amendments increase the required amount of compensation under the FLSA exemptions. These amendments have been enjoined from implementation and enforcement since November 22, 2016. *Nevada* v. *United States Dep't of Labor*, 218 F. Supp. 3d 520, 534 (E.D. Tex. 2016). Accordingly, the Court applies the regulations in effect prior to the injunction.

this exemption, the director adopts by reference and incorporates herein 29 C.F.R. Part 541 (July 1, 2005).").

Whether an employee meets the requirements of the executive exemption when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700. 29 C.F.R. 541.106(a). Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. *Id*. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. *Id*. An employee whose primary duty is ordinary production work or routine, recurrent, or repetitive tasks cannot qualify for exemption as an executive. *Id*. "The employer has the burden to prove that its employee is an executive and therefore exempt from the FLSA's overtime pay requirements." *Madden,* 745 F.3d at 903 (citing *Fife v. Harmon,* 171 F.3d 1173, 1174 (8th Cir.1999)).

Because the Court finds genuine issues of material fact in dispute as to two of the required four factors, the Court denies Texas CES's motion for summary judgment on the exemption and does not address the remaining factors.

### a.     **Management As Primary Duty**

Texas CES submits that Mr. Buford managed a customarily recognized subdivision of Texas CES—his crew (Dkt. No. 31, at 14). The pertinent Department of Labor regulation defines the term management to include:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques

19

to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Factors to consider include the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.*

"[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). "Time alone . . . is not the sole test, and nothing in [the FLSA] requires that exempt employees spend more than 50 percent of their time performing exempt work." *Id.* Rather, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.* Finally, "applying the executive exemption is 'an inherently fact based inquiry' that depends on the many details of the particular job duties and actual work performed by the employee seeking overtime pay." *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1263 (11th Cir. 2008).

As explained above, the Court is unable to determine Mr. Buford's primary duty as a matter of law based on the record before it. There are genuine issues of material fact in dispute. This requirement has not been met.

### b. Weight Given To Suggestions And Recommendations

The Court also is unable to determine on the record evidence whether Mr. Buford meets the requirement of having "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). Factors used to determine whether an employee's suggestions and recommendations are given particular weight include whether making such suggestions and recommendations is part of the employee's duties and the frequency with which the employer's suggestions and recommendations are relied upon. 29 C.F.R. § 541.105. An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status. 29 C.F.R. § 541.105. The requirement does not include an occasional suggestion with regard to the change in status of a co-worker. *Id.* Courts previously addressing what is required by the fourth element of the FLSA executive exemption suggest that more than informal input is needed to prove applicability of the executive exemption. *Madden,* 745 F.3d at 904 (collecting cases). Texas CES has the burden to come forward with sufficient, undisputed record evidence to demonstrate that the fourth element of the executive exemption is met. *Thomas v. Speedway SuperAmerica, LLC,* 506 F.3d 496, 501 (6th Cir. 2007).

The Court finds that Texas CES has failed to meet its burden at the summary judgment stage. Texas CES has not presented sufficient record evidence to demonstrate that the giving of suggestions and recommendations are part of the job duties of rig supervisors or that Mr. Buford's suggestions were given particular weight or frequently relied upon. *See e.g. Rock v. Sunbelt Cranes, Constr. & Hauling, Inc.,* 678 F. Supp. 2d 1264, 1269 (M.D. Fla. 2009) (element not met

where, though plaintiff has limited authority to fire employees and witness testified that he sought plaintiff's suggestions and recommendation regarding promotion, plaintiff infrequently exercised his power to hire or fire and his suggestions were not a considerable part of his job duties.).  Texas CES states that Mr. Buford's observations of crew members were given particular weight because the yard manager was rarely present at the well sites.  However, Texas CES presents only one instance of Mr. Buford voicing concerns to the yard manager about a crew member "taking pills" and stating that the crew member "wasn't coming back to my crew" (Dkt. No. 33, ¶ 63).  There is no evidence that this recommendation was, or any others were, given any particular weight, frequently made, or frequently relied upon.  This requirement has not been met by Texas CES on the record evidence.

As such, Texas CES has failed to show on this record evidence that it is entitled to judgment as a matter of law on whether Mr. Buford falls within the executive exemption.  The Court denies Texas CES's motion for summary judgment on the issue of whether Mr. Buford qualifies as an exempt executive employee.

### B.    FMLA Claim

Texas CES contends that Mr. Buford's FMLA claim fails as a matter of law because he is not an "eligible employee" within the meaning of the FMLA (Dkt. No. 31, at 22).  An "eligible employee" is "an employee who has been employed—(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title;  and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."  29 U.S.C. § 2611(2)(A).  As a threshold matter, an employee who is employed at a work site at which the employer employs less than 50 employees is not an eligible employee under the FMLA if the total number of employees employed by that employer within 75 miles of that work site is less than 50.

29 U.S.C. § 2611(2)(B)(ii).  Whether 50 employees are employed within 75 miles to ascertain an employee's eligibility for FMLA benefits is determined when the employee gives notice of the need for leave.  29 C.F.R. § 825.110(e).  Further, the determination of how many employees are employed within 75 miles of an employee is based on the number of employees maintained on the payroll.  29 C.F.R. § 825.111(c).  The plaintiff bears the burden of showing the existence of an FMLA claim.  *Morrison v. Amway Corp.,* 323 F.3d 920, 930 (11th Cir. 2003); *Podkovich v. Glazer's Distributors of Iowa, Inc.*, 446 F.Supp.2d 982, 1000 (N.D. Iowa 2006).

Texas CES contends that, as of October 2015, there was only one yard within a 75 mile radius of the Magnolia Yard and that the total number of employees in both yards was less than 50 (Dkt. No. 31, at 23).  Texas CES further contends that, even if Mr. Buford was an eligible employee, he would have lost his job due to the closure of the Magnolia Yard.  In support of its motion, Texas CES submits the declaration of Shauna Clark, Division Human Resources Director for Texas CES (Dkt. No. 30-4).  Ms. Clark states:

> When the Magnolia Yard closed in October 2015, it had 17 employees.  The Minden Yard, which is the only yard within 75 miles of Magnolia, had 18 employees at the time.  The next closest yard is Marshall, Texas.

(*Id.*, ¶ 9).

The parties agree that Texas CES's only Arkansas yard was its Magnolia Yard and that Mr. Buford worked mostly out of the Magnolia Yard (*Id.*, ¶ 11).  There is evidence before the Court that Mr. Buford worked in parts of Arkansas and Louisiana from May 2014 to October 2015, as well as evidence that Mr. Buford was administratively transferred to the Minden Yard in Louisiana in October 2015.  Minden Yard was the closest yard to Magnolia Yard.  Ms. Clark confirms that the next closest yard is in Marshall, Texas, which appears to be within 75 miles from Minden, Louisiana.  She is silent on the number of employees there.  Mr. Buford contends that a

reasonable fact-finder could conclude that Texas CES violated his "FMLA rights by terminating his employment rather than keeping him 'administratively transferred' to Minden for the duration of his FMLA lease."  (Dkt. No. 38, at 13).

However, the parties do not dispute that, at the time Mr. Buford gave notice of his need for FMLA leave in October 2015, he worked at the Magnolia Yard.  Mr. Buford submits in his deposition testimony that he spoke first to his yard manager, Raymond Thompson, about his need for FMLA leave, then to Mr. Hutchinson, the area supervisor.  During his conversation with Mr. Hutchinson, Mr. Buford was given the choice of accepting an hourly position at the Minden Yard or being laid off (Dkt. No. 39, ¶¶ 73, 75).  Mr. Buford was then administratively transferred to the Minden Yard and was permitted to use his accrued vacation time through November 2015 (*Id.*, ¶ 75).  Mr. Buford's actual last day of work was in in mid-October 2015 (Dkt. No. 33, ¶ 76).  There is no record evidence before the Court that Mr. Buford renewed his request for FMLA leave once he was administratively transferred to the Minden Yard.

The determination of Mr. Buford's status as an eligible employee is determined when he gave notice of his need for leave—in other words, in October 2015, while he was employed at the Magnolia Yard.  29 C.F.R. § 825.110(e).  Based on the evidence before the Court, the Magnolia Yard employed 17 employees in October 2015 and the only other work site within a 75 mile radius of the Magnolia Yard was the Minden Yard where 18 employees were employed.  There were not 50 employees employed within a 75 mile radius of Mr. Buford's work site at the time he requested FMLA leave.  As such, Mr. Buford was not an eligible employee within the meaning of the FMLA.

Based on the record evidence, construing all reasonable inferences in favor of Mr. Buford, the Court concludes that Texas CES has demonstrated through record evidence that there is no

genuine issue of material fact in regard to Mr. Buford's eligibility for FMLA leave. For these reasons, the Court grants summary judgment to Texas CES on Mr. Buford's FMLA claim.

**IV.     Conclusion**

For the foregoing reasons, the Court denies Texas CES's motion for summary judgment as to Mr. Buford's FLSA and AMWA claims and grants the motion as to Mr. Buford's FMLA claim (Dkt. No. 30).

So ordered this 1st day of June, 2018.

Kristine G. Baker
United States District Court Judge